# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

HOPE R. WALLACE,              :

     Plaintiff,            :

                                        Case No. 3:10cv00199

 vs.                   :

                                        District Judge Timothy S. Black

MICHAEL J. ASTRUE,        :     Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,     :

     Defendant.           :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

Plaintiff Hope R. Wallace filed an application for Disability Insurance Benefits (DIB) with the Social Security Administration claiming that she had been unable to perform a gainful job, beginning on January 10, 2003, due to her disabilities.[2] (Tr. 81-83).  Her asserted disabilities, then and now, consisted of a torn rotator cuff, fibromyalgia, lumbar spondylosis, cervical inter-vertebral disc displacement without myelopathy; cervical radiculopathy with neuritis; lumbar radiculitis tear; hand swelling; Raynaud's phenomenon; rheumatoid arthritis; and possible lupus. (Tr. 158).

---

[1]  Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2]  Plaintiff previously filed three unsuccessful applications for Social Security disability benefits. (Tr. 18, 37-39, 74-76, 78-80).

After various administrative proceedings, including a hearing held on October 25, 2007, *see* Tr. 473-512, Administrative Law Judge (ALJ) Melvin A. Padilla denied Plaintiff's DIB application based on his conclusion that her impairments did not constitute a "disability" within the meaning of the Social Security Act.  (Tr. 30).

Plaintiff brings the present case pro se, challenging ALJ Padilla's decision.  This Court has subject matter jurisdiction over this matter because the ALJ's decision constitutes the final administrative decision denying Plaintiff's DIB application.  *See* 42 U.S.C. §405(g).  The case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #10), the administrative record, and the record as a whole.

Plaintiff seeks an Order reversing the ALJ's decision and remanding the case for an award of benefits.  The Commissioner seeks an Order affirming the ALJ's decision.

## II.    BACKGROUND

### A.    <u>Plaintiff and Her Testimony</u>

Plaintiff was 46 years old on her alleged disability onset date.  She attained age 50 in 2006 and is therefore considered to be "closely approaching advanced aged" for purposes of resolving her DIB eligibility.  *See* 20 C.F.R. § 404.1563; *see also* Tr. 28, 81. She has a high school education and completed one year of college.  *See* 20 C.F.R. § 404.1564(b)(4).  (Tr. 108).  Over the years, Plaintiff has worked as an office clerk, a medical office clerk, and a 911 operator.  (Tr. 159, 177-84).

2

During ALJ Padilla's hearing, an attorney represented Plaintiff.  Plaintiff testified that she last worked for two years (until January 2003) as a program support assistant. (Tr. 479).  She explained that she could no longer work due to rheumatoid arthritis, fibromyalgia, Raynaud's phenomenon, and "trouble" with her neck, back, and feet.  (Tr. 480).  She testified that Dr. Wolfe and another rheumatologist, Dr. Stevens, verified she suffered from rheumatoid arthritis.  *Id.*  She took Humira injections, Prednisone, Ibuprofen, and Flexeril.  *Id.*  Plaintiff also explained that medication made her prone to illness, caused her swelling, increased her appetite, and made her feel "doped up."  (Tr. 486).

Plaintiff's symptoms included neck pain and pain in all her joints, including her shoulders, knees, wrists, and ankles.  (Tr. 481).  She experience this pain daily.  *Id.*  She described feeling a sharp pain in the middle of her low back that radiated down her left leg.  (Tr. 483).  She admitted that physical therapy had helped in the past.  *Id.*  She denied wearing a back brace.  (Tr. 484).  And she acknowledged that epidural injections seemed to help.  *Id.*

At one point during the hearing, Plaintiff showed her hands to the ALJ and explained that they were swollen.  She offered to move closer to the ALJ, but the ALJ replied that he could see her hands from where he sat.  (Tr. 485-86).  Plaintiff asserts in the instant case that this incident was one way the ALJ's hearing was unfair to her.

Plaintiff further testified that she could walk for seven minutes at a time; stand for five minutes; sit for forty-five minutes; and lift five pounds.  (Tr. 487-88).  She estimated

3

that she could stand for one hour total in a day and could sit for about three hours out of eight.  (Tr. 494).

Plaintiff also testified about her daily activities.  She drove three or four times a week.  (Tr. 478).  She lived by herself.  She cooked (sometimes), washed dishes, vacuumed, did the laundry, and dusted (sometimes).  (Tr. 488-89).  She could use her upper extremities to get dressed, brush her hair, and button or zip her clothes.  (Tr. 488). She went shopping.  On Sundays she would attend hour-long church services.  (Tr. 489). She sometimes used her home computer.  *Id.*  She was rarely visited by her sister, but she did talk on the phone with her sister and with a few others.  (Tr. 490).  She watched television and sometimes did some reading.  *Id.*

Plaintiff further testified that she could not go back to work because of pain, fatigue, depression, and stomach upset (due to Motrin).  (Tr. 493).  She could not get out of bed two or three days a week.  *Id.*  She also reported that she had swollen ankles and plantar fasciitis.  (Tr. 495).

### B.     Medical Records and Opinions

### 1.
### Sanford M. Wolfe, D.O.

Starting in August 2004 Plaintiff saw Dr. Wolfe, a rheumatologist, for treatment. (Tr. 411-46).  Dr. Wolfe noted that Plaintiff had a few tender trigger points but no clinical signs to suggest "a real active fibromyalgia."  (Tr. 444-45).  On physical examination Dr.

Wolfe noted "some soft ... findings that could suggest an early inflammatory arthritis." *Id.*

Dr. Wolfe reported that despite a history of myofascial pain, "it doesn't seem to be a big issue at this point." (Tr. 444). He recommended further investigation and pain medication. (Tr. 445).

In December 2004 Dr. Wolfe wrote a letter to Plaintiff informing her that he believed she had rheumatoid arthritis and needed a medication adjustment. (Tr. 439).

Plaintiff did not see Dr. Wolfe again until February 2006, at which time she complained of moderate diffuse pain, particularly in her hands, wrists, shoulders, elbows, feet, knees, and ankles. She also reported that she had experienced about two hours of morning stiffness and was not functioning as well as she wanted. (Tr. 432, 434-35).

On physical examination, Plaintiff had no major findings outside her joints and no grossly swollen joints. (Tr. 434). Dr. Wolfe found some subtle swelling in the left wrist and some "MCP" (metacarpophalangeal) joints along with tenderness in the shoulders, ankles, and some of her "MTP" (metatarsophalangeal) joints. *Id.* Counting her symptomatic joints, Dr. Wolfe felt that she had about ten tender and eight swollen joints. *Id.* X-rays of Plaintiff's hands and feet in February 2006 did not show any joint space narrowing or erosions. (Tr. 436). Dr. Wolfe concluded, "While she does have some tender trigger spots, they are really not widespread and not numerous and I think fibromyalgia would be less of an issue, I did not see any evidence of digital cyanosis but if she does have Raynaud's I think it would be secondary to an RA [rheumatoid arthritis]

5

process.  I would lean towards RA as the main musculoskeletal problem at this point."
(Tr. 423, 432).  Dr. Wolfe recommended and treated Plaintiff with medications, such as
Prednisone, Methotrexate, Arava, and Humira, which he altered over the next year.  (Tr.
420, 425, 428).

In March 2007 Dr. Wolfe altered Plaintiff's medication regimen and expressed
concern about her non-compliance with treatment.  (Tr. 412).  Two months later Dr.
Wolfe repeated his concern about Plaintiff's non-compliance with treatment.  (Tr. 452).

**2.**
**Robert A. Schriber, M.D.**

In late 2004 Dr. Schriber, a rheumatologist, examined Plaintiff and found "no
evidence of joint swelling, warmth, effusion, deformity or limitation of motion."  (Tr.
338).  He noted that Plaintiff's "rheumatoid factor is positive in significant titer (227).
An ANA is positive in moderate titer at 1:320.  A sed rate (10), comprehensive metabolic
panel, CBC, urinalysis, TSH and CPK are normal."  (Tr. 338).  Dr. Schriber opined that
Plaintiff's lab results did not meet the criteria for a chronic inflammatory rheumatic
illness; he suspected a component of fibromyalgia syndrome and recommended
medication and exercise.  (Tr. 338-39).

**3.**
**Glenda Lopez-Blaza, M.D.**

The record contains the progress notes of Plaintiff's primary care physician, Dr.
Lopez-Blaza, from December 2004 through March 2007.  (Tr. 322-25, 397-410).  Dr.
Lopez-Blaza treated Plaintiff with prescription anti-anxiety and pain medications.  (Tr.

322, 324, 325, 397, 399, 401-02, 406).  A bone scan in December 2004 showed "minimal findings" and was suggestive of degenerative change in the low back, elbows, and shoulders.  (Tr. 313).

In March 2007 Dr. Lopez-Blaza completed a functional capacity questionnaire. (Tr. 387-90).  Dr. Lopez-Blaza diagnosed Plaintiff with rheumatoid arthritis, fibromyalgia, and degenerative disc disease in her neck.  (Tr. 387).  She also indicated that Plaintiff had depression, which affected her physical condition.  (Tr. 388).  Dr. Lopez-Blaza checked a boxes indicating that (1) Plaintiff's symptoms constantly interfered with her ability to attend to and concentrate on simple tasks, and (2) she could not handle low-stress work.  *Id.*  Dr. Lopez-Blaza briefly noted that Plaintiff's inability to handle low-stress work was due to her "severe pain."  *Id*.

Dr. Lopez-Blaza further indicated that Plaintiff could sit for less than two hours a day, one hour at a time; stand less than two hours out of eight, fifteen minutes at a time. During the workday, Plaintiff needed to walk every ninety minutes for five minutes at a time.  (Tr. 388-89).  Plaintiff also needed to change positions at will, to take fifteen minute breaks every two hours, and to elevate her legs 50% of the time.  (Tr. 389). According to Dr. Lopez-Blaza, Plaintiff could rarely lift up to ten pounds; she could occasionally move her head; she could occasionally twist, stoop, and climb stairs; but she could rarely crouch or climb ladders.  (Tr. 389-90).  Plaintiff could use her hands to grasp and for fine manipulation five percent of the time, and she could use her arms for overhead reaching ten percent of the time.  (Tr. 390).

**4.**
**Paul S. Morton, M.D.**

A state agency record-reviewing physician, Dr. Morton, opined in April 2005 that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, and she could sit and stand/walk for about six hours each out of eight with no other limitations.  (Tr. 326-33).  Dr. Morton wrote:

> Claimant alleges generalized joint and muscle pain.  Has history of right rotator cuff repair in 1999.  EMG/NCV 8/13/04, of her right arm was essentially normal.  Cervical spine and lumbar MRI's show DDD with disc bulges at several levels.  Claimant has a significantly elevated RA factor, but does not meet ACR [American College of Rheumatology] criteria for any specific disease.  It is thought that claimant likely has fibromyalgia.  Current examinations show she has full ROM [range of motion] of all joints, 5/5 muscle strength throughout, normal reflexes, normal sensation and no muscle atrophy.  Mild swelling was noted in the joints of her index finger due to tenosynovitis.  Pain was considered in this RFC assessment.

(Tr. 327).  Dr. Morton believed, "Claimant's statements regarding the severity of her limitations are not supported by the objective medical evidence."  (Tr. 331).

**5.**
**Paul R. Boyce, M.D.**

Dr. Boyce, a non-treating physician, testified during the ALJ's hearing.  He began by describing Plaintiff's medical records in detail and at length.  (Tr. 497-504).

Dr. Boyce noted that Plaintiff had not been compliant in taking medication and had not complained of medication side effects to Dr. Wolfe.  (Tr. 503-04).  Dr. Boyce recognized that even though the record showed some trigger points, no "physician ever

8

came to the point where they identified the criteria needed to make the firm diagnosis" of fibromyalgia. (Tr. 505).

Dr. Boyce opined that Plaintiff did not meet or equal any impairment described in the Social Security Regulation's Listing of Impairment (the Listings).[3] (Tr. 505-06). Dr. Boyce further testified that the treatment records did not document any complaints of fatigue. (Tr. 507). And Dr. Boyce concluded that Plaintiff could do light work[4] with only frequent fine manipulation and gripping, restricted overhead lifting, and no exposure to extreme cold. (Tr. 508).

### C. Vocational Expert's Testimony

A vocational expert, testified during the ALJ's hearing. The ALJ asked him to describe the jobs available to a hypothetical individual of Plaintiff's age, education, and prior relevant work experience, who retained the ability to perform light work with a temperature-controlled environment, frequent handling, fine manipulation and gripping, no overhead activity with the right arm, and low stress, not fast-paced work. (Tr. 510). The vocational expert testified that such a hypothetical person could perform Plaintiff's past work as an office clerk or medical office clerk. *Id.* He also testified that this

---

[3] If a claimant's health troubles meet or equal an impairment described in the Listings, he or she is under a benefits-qualifying "disability." *See* 20 C.F.R. §404.1520(a)(4)(iii); *see also* Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

[4] Under the Regulations, "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §404.1567(b).

hypothetical person could perform other light jobs such as a mail clerk, routing clerk, and microfilm camera operator.  *Id.*

According to the vocation expert, at the sedentary exertional level, a hypothetical person with Plaintiff's limitations could perform such jobs as a charge account clerk, type copy examiner, and telephone quotation clerk.[5]  (Tr. 511).

The vocational expert testified that adding an additional limitation of needing to alternate positions, it would reduce the light level jobs to 15,000, eliminating the microfilm camera operator position.  *Id.*  The additional limitation would reduce the sedentary jobs to 3,500, with all positions remaining.  *Id.*

When cross-examined by Plaintiff's counsel, the vocational expert testified that if the hypothetical person was subject to having four days of un-excused absences a month, they would be subject to probable disciplinary action and subsequent termination.  (Tr. 511-12).

## III.    THE "DISABILITY" REQUIREMENT AND THE ALJ'S DECISION

The term "disability" as defined by the Social Security Act carries a specialized meaning of limited scope.  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2)

---

[5]  Under the Regulations, those able to perform sedentary work are in the lowest category of work ability.  *See* 20 C.F.R. §404.1567(a)-(e).  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." §404.1567(a).

from engaging in "substantial gainful activity" that is available in the regional or national economies.[6]  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

ALJ Padilla resolved Plaintiff's disability claim by using the five-Step sequential evaluation required by Social Security Regulations.  *See* Tr. 19-20; *see also* 20 C.F.R. §404.1520(a)(4).  The ALJ's most pertinent findings arose at Steps 2 through 5.

The ALJ found at Step 2 that Plaintiff had severe impairments consisting of lumbar and cervical disc disease; mild rheumatoid arthritis with noncompliance with therapy; and residuals of right shoulder surgery.  (Tr. 23).

The ALJ determined at Step 3 that Plaintiff did not have a Listings-level impairment.  (Tr. 26).

At Step 4 the ALJ concluded that Plaintiff could perform a range of light work limited to lifting ten pounds frequently and twenty pounds occasionally; working in a temperature-controlled environment; performing frequent but not constant fine manipulation, handling, and gripping; working with no overhead activities with the right upper extremity; and working low-stress jobs that were not fast paced.  (Tr. 26).  In light of these abilities, and based on the vocational expert's testimony, the ALJ also found at Step 4 that Plaintiff was able to perform her past relevant work as an office clerk and medical office clerk.  (Tr. 28).  Although this conclusion meant that Plaintiff was not

---

[6]  Impairments also must be expected either to cause death or last 12 months or longer. *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.

under a disability, the ALJ continued his sequential analysis through Step 5 and found that Plaintiff could perform work available in the national economy.  *See* Tr. 28-30.

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and was not eligible for DIB.

## IV.    JUDICIAL REVIEW

Judicial review determines, in part, " whether the ALJ applied the correct legal standards..." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).  Social Security Regulations and caselaw establish those standards by, for example, instructing ALJs to provide "good reasons" for the weight placed on a treating physician's opinions.  *See* 20 C.F.R. §404.1527(d)(2); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004).

> It is an elemental principle of administrative law that agencies are bound to follow their own regulations....  The Supreme Court has long recognized that a federal agency is obliged to abide by the regulations it promulgates....  An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an individual's constitutional right to due process. Where a prescribed procedure is intended to protect the interests of a party before the agency, even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed.

*Wilson*, 378 F.3d at 545 (internal citations and punctuation omitted).

Judicial review of an ALJ's decision also considers "whether the findings of the ALJ are supported by substantial evidence."  *Blakley*, 581 F.3d at 406; *see Bowen*, 478

12

F3d at 745-46.  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..."  *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).  Substantial evidence is present "if a 'reasonable mind might accept the relevant evidence as adequate to support..." the ALJ's factual findings.  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r. of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004). The existence of substantial evidence does not depend on whether the Court disagrees or disagrees with the ALJ's findings.  *Rogers*, 486 F.3d at 241; *see Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead the ALJ's decision is affirmed "if his findings and inferences are reasonably drawn from the record or supported by substantial evidence even if that evidence could support a contrary decision."  *Wright-Hines v. Comm'r. of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010).

"Yet, even if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec*.  582 F.3d 647, 651 (6th Cir. 2009); *see Wilson*, 378 F.3d at 546-47; *see also Kalmbach v. Comm'r. of Soc. Sec*., 2011 WL 63602 at *6 (6th Cir. 2011)("we must reverse and remand if the ALJ applied the incorrect legal standards, even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different.")

13

V.    **DISCUSSION**

A.    <u>**Plaintiff's First Contentions**</u>

Plaintiff contends that the ALJ "erroneously rejected the opinion of a doctor who has been treating [her] for years." (Doc. #9 at 35). Plaintiff is apparently referring to her treating primary care physician, Dr. Lopez-Blaza, who evaluated Plaintiff's functional capacity in March 2007 and concluded, essentially, that Plaintiff's rheumatoid arthritis, fibromyalgia, degenerative disc disease in her neck, and pain precluded her from working. (Tr. 387-90).

Social Security Regulations and case law require ALJs to apply controlling weight to a treating medical source's opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *See* 20 C.F.R. §404.1527(d)(2); *see also Rabbers*, 582 F.3d at 660; *Rogers*, 486 F.3d at 242; *Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If a treating medical source's opinion is not entitled to controlling weight, it must be weighed under "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242.

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §404.1527(d)(1). However, the opinions of non-examining state agency medical

14

consultants have some value and can, under some circumstances, be given significant weight.  This occurs because the Commissioner views non-examiners "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p, 1996 WL 374180 at *2 .  Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization.  *See* 20 C.F.R. §404.1527(d), (f); *see also* Soc. Sec. Ruling 96-6p, 1996 WL 374180 at *2-*3.

In the present case, the ALJ declined to place controlling or substantial weight on Dr. Lopez-Blaza's opinions because they were poorly supported by any detailed medical findings and inconsistent with other substantial evidence.  (Tr. 27).  In this manner the ALJ applied the correct legal criteria spelled out in 20 C.F.R. §404.1527(d)(2).  A review of Dr. Lopez-Blaza's March 2007 report confirms the ALJ's reasons.  Other than listing several diagnoses and noting Plaintiff's "severe pain," Dr. Lopez-Blaza provided no reasons in support of her opinions about Plaintiff's limited physical and mental abilities.  *See* Tr. 387-90.  Substantial evidence – Dr. Lopez-Blaza's report itself – supports the ALJ's decision to discount her opinions.

In addition, based on the ALJ's consideration of evidence in the entire record, he reasonably concluded that Plaintiff was capable of performing a range of light work activities consistent with the limitations in the opinions provided by Dr. Boyce, the medical expert who testified during the ALJ's hearing.  (Tr. 497-508).  During his

15

testimony, Dr. Boyce described Plaintiff's medical records in detail and based his opinion on all of Plaintiff's conditions.  *See* Tr. 507-08.  Dr. Boyce's opinions about Plaintiff's work limitations and abilities were likewise consistent with Dr. Morton's opinions.  Dr. Morton was a reviewing medical consultant; he concluded – based on his supporting explanation – that Plaintiff could perform light work.  (Tr. 327-30, 508).

Moreover, the ALJ further considered Plaintiff's treatment history, and noted that Dr. Boyce observed that Plaintiff may have sometimes resisted taking medication consistently as directed.  (Tr. 502; *see* Tr. 413, 439, 452).  The ALJ also reviewed Plaintiff's objective medical evidence, noting an MRI resulted in findings consistent with a right shoulder rotator cuff abnormality.  (Tr. 23, 215-216).  The ALJ additionally documented the diagnostic imaging from 2002 and 2004 indicating mild or moderate changes in Plaintiff's neck and back.  (Tr. 23, 222-25, 309-12).  The ALJ referenced the imaging of Plaintiff's hands and feet, (Tr. 23, 25 281, 298), and he noted that three separate EMG tests showed either no or mild findings.  (Tr. 23, 25, 213, 219, 303).  Finally, the ALJ indicated that no physician found proper clinical evidence of fibromyalgia, and only mild findings of rheumatoid arthritis (Tr. 23-25).

Accordingly, substantial evidence supports the ALJ's evaluation of the medical source opinions and his assessment of Plaintiff's residual functional capacity.

**B.**     **Fair Administrative Hearing**

Plaintiff contends that she did not receive a fair hearing because the ALJ refused to look at her hands, "snapped" at her once, and said he did not have time to engage in additional testimony.  These contentions fail to reveal a reversible error in the ALJ's decision or a lack of substantial supporting evidence.

Plaintiff testified at some length during the ALJ's hearing about her physical impairments including, in part, her fibromyalgia, pain in her neck, back and feet, rheumatoid arthritis and Raynaud's phenomenon, and she testified about her limited ability to engage in daily activities.  *See* Tr. 477-97.  Nothing in the record of the hearing suggests that Plaintiff she received an unfair hearing or that the ALJ held a bias against Plaintiff or her counsel.

Evaluating the possibility of ALJ bias begins "with the 'presumption that policymakers with decision making power exercise their power with honesty and integrity.'  The burden of overcoming that presumption of impartiality 'rests on the party making the assertion [of bias],' and the presumption can be overcome only with convincing evidence that 'a risk of actual bias or prejudgment' is present."  *Collier v. Comm'r of Soc. Sec.*, 108 Fed.Appx. 358, 363-64 (6th Cir. 2004)(quoting in part *Navistar Int'l. Transportation Corp. v. United States EPA*, 941 F.2d 1339, 1360 (6th Cir. 1991)(other citation omitted; brackets in *Collier*).  "Stated differently, 'any alleged prejudice on the part of the decision maker must be evident from the record and cannot be based on speculation or inference.'"  *Collier*, 108 Fed.Appx. at 364 (citations omitted).

17

During the ALJ's hearing, he asked to see Plaintiff's hands.  Upon viewing her hands he stated that he did not see any swelling or deformity.  (Tr. 485).  When Plaintiff stated that they were swollen and offered to come closer, the ALJ replied that he could see her hands from where he sat.  Plaintiff responded, "Okay."  (Tr. 485-86).

No bias appears from the fact that the ALJ declined Plaintiff's offer to move closer so she could better show him her hands because the ALJ accepted, in his decision, that Plaintiff had swollen joints and other impairments affecting her hands.  (Tr. 24).  The ALJ also incorporated "some limitations on the use of the hands ... to accommodate any symptoms from the combination of conditions that may affect hand functions."  (Tr. 25).

Accordingly, Plaintiff's unfairness contentions lack merit.

### C.    Rheumatoid Arthritis and Pain

Plaintiff asserts that the ALJ erred in his analysis of her rheumatoid arthritis and the associated pain.  This assertion lacks merit.

The ALJ found at Step 2 that Plaintiff has the "severe impairment" of "mild rheumatoid arthritis with noncompliance with therapy."  (Tr. 23).  His findings at Step 3 – which considered Plaintiff's impairments individually and in combination – included consideration of rheumatoid arthritis.  *See* Tr. 23-26.  The ALJ also referenced both Dr. Schriber's and Dr. Wolfe's treatment records in his summary of the record.  (Tr. 23-24, *see* Tr. 338-39, 411-46).  And the ALJ noted:

> [Plaintiff's] complaints of pain and swelling in peripheral joints have been accompanied by only some rather "subtle" or "soft" evidence of joint

18

> inflammation such as some swelling, but laboratory tests have been generally positive for mild or early rheumatoid arthritis. [Plaintiff's] inflammatory joint complaints likely have been somewhat more difficult to control due to compliance issues or at least her apparent resistance or intolerance for certain medications such as Prednisone and Methotrexate. In any case, her inflammatory joint disease is "severe" as it affects her exertional capacity and dexterous functions.

(Tr. 24). Plaintiff has not provided any reasoned argument or meaningful discussion of evidence supporting the conclusion that the ALJ erred or that Plaintiff meets or equals Listings for rheumatoid arthritis.

Accordingly, Plaintiff's assertions do not show reversible error in the ALJ's decision or a lack of substantial supporting evidence.

### D.    Plaintiff's Additional Evidence

Plaintiff submitted additional evidence to the Appeals Council when she requested review of the ALJ's decision. (Tr. 472). Where, as in Plaintiff's case, the Appeals Council denied review of the ALJ's decision, that decision constitutes the final decision of the Commissioner subject to review. Consequently, Plaintiff's additional evidence was not part of the record on which the Commissioner's final decision was based and, furthermore, it is not considered part of the administrative record subject to judicial review. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); see also *Casey v. Secretary of Health & Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993); *see also Cotton v. Sullivan*, 2 F.3d 692 (6th Cir. 1992); *Wyatt v. Secretary of Health & Human Services*, 974 F.2d 680, 685 (6th Cir. 1992).

### E.    __Vocational Expert Testimony__

Plaintiff maintains that the ALJ also failed to consider the cross-examination testimony of the vocational expert that an individual would be subject to disciplinary action or termination if they had un-excused absences on the job.  Yet assuming the ALJ overlooked this testimony does nothing to show that he erred or that Plaintiff was under a benefits-qualifying disability.  If credited, the testimony is too general and conclusory; it focuses no light on Plaintiff's specific health problems or her resulting work abilities and limitations

Plaintiff has also not shown that the ALJ erred with regard to the vocational expert.  In fashioning the hypothetical question to be posed to the vocational expert, an ALJ "is required to incorporate only those limitations accepted as credible."  *Casey,* 987 F.2d at 1235; *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints" and "can present a hypothetical to the [vocational expert] on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate.").  As long as the limitations set by an ALJ's hypothetical question are supported by evidence, the presence of conflicting evidence will not invalidate the hypothetical question.  *See Entler v. Comm'r of Soc. Sec.*, 73 Fed. Appx. 868, 872 (6th Cir. 2003) (citing *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927-28 (6th Cir. 1987)).

As discussed previously, Plaintiff has not shown that the ALJ committed error in his assessment of her residual functional capacity or that the ALJ's assessment was unsupported by substantial evidence. Consequently, the ALJ's questions to the vocational expert accurately portrayed a hypothetical individual with Plaintiff's limitations, and the ALJ, therefore, did not err in relying on the vocational expert's testimony. *See Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6th Cir. 1987).

### F.    Summary

In conclusion, the ALJ reasonably found that Plaintiff could perform a limited range of light work. The ALJ further found that, consistent with those work-related limitations, Plaintiff's job descriptions, and the vocational expert's testimony that Plaintiff could perform her past relevant work as an office clerk and medical office clerk and that, as a result she was not under a "disability" as defined by the Social Security Act. *See* 20 C.F.R. §404.1520(e) (a claimant is considered "not disabled" where he retains the Residual Functional Capacity to perform his past relevant work either as he actually performed it or as it is performed in the national economy).

Accordingly, Plaintiff's Statement of Errors lacks merit.

### IT THEREFORE IS RECOMMENDED THAT:

1.    The Commissioner's non-disability determination be AFFIRMED; and

2.    The case be terminated on the docket of this Court.

July 14, 2011                                         s/Sharon L. Ovington
                                                        Sharon L. Ovington
                                              United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).